SO ORDERED: December 15, 2006.

_____
**James K. Coachys
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DOUGLAS R. THOMAS, ) | Case No. 05-09791-JKC-7 |
| ) | |
| Debtor. ) | |

**ORDER ON MOTION FOR ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE EXPENSES**

This matter came before the Court on William J. Tucker's Motion for Allowance and Payment of Administrative Expenses on the Claim of William J. Tucker, State Court Receiver and on the Objections thereto filed by the Gregory K. Silver, the Chapter 7 Trustee, and Debtor Douglas R. Thomas.  Following a hearing on October 11, 2006, the Court took the matter under advisement and now issues the following Order.

**Findings of Fact**

1. Douglas R. Thomas ("Thomas") and David Byard ("Byard") are equal members in Village Development One, LLC ("Village").  The principal asset of Village was certain real property located in Zionsville, Indiana.  (The "Village Property").

2. Byard and Thomas, through Village, intended to develop the Village Property. Disputes arose, however, regarding that development, including a dispute with Curran Architecture ("Curran"), which had been retained to design the plans for the development (the "Plans").

3. On December 9, 2004, Curran filed a complaint in Hamilton Superior Court against Thomas, Byard and Village, alleging that monies were due and owing to Curran for the project.

4. On or about January 21, 2005, Thomas filed a complaint against Byard in Marion Superior Court alleging that Byard had breached his fiduciary duties and/or contractual obligations to Thomas and Village. Byard counterclaimed, alleging that Thomas had breached his fiduciary duty to Byard and Village.

5. On February 9, 2005, a receivership was established in Marion Superior Court over all property owned by Executive Charter Services, LLC ("ECS"), Laminating Associates, LLC ("Laminating") and Thomas (the "Receivership"). William J. Tucker ("Tucker") of Tucker & Associates was appointed as the Receiver. Such cause is docketed as Cause Number 49D03-0412-PL-2357 (the "Receivership Action").

6. As Receiver, Tucker quickly determined that ECS was a shell corporation with no assets.

7. On February 14, 2005, an involuntary petition under Chapter 7 of the United States Bankruptcy Code was filed against Laminating, thereby removing Laminating from the receivership (the "Laminating Bankruptcy").

8. With Laminating removed from the Receivership and ECS a shell corporation, Tucker spent most of his time as Receiver recovering, preserving and protecting Thomas's membership interest in Village (the "Thomas Interest"). More particularly, Tucker engaged in

2

negotiations with various parties regarding the sale of the Thomas Interest and/or Village Property.

9. On or about March 14, 2005, Thomas received an offer from Britton Building & Design, Inc. ("Britton") to purchase the Village Property for $655,000 (the "Purchase Agreement").

10. According to the terms of the Purchase Agreement, Village was to make available at closing ["t]o the extent available, a complete set of architectural, mechanical and electrical plans and specifications used for the construction of the improvements."

11. On April 4, 2005, Tucker conducted ten hours of settlement negotiations with Byard and Thomas that resulted in an agreement (the "Settlement Agreement"), whereby Village had until May 4, 2005, to enter into the Purchase Agreement as modified by the Settlement Agreement. If Britton terminated the Purchase Agreement or failed to closed the sale by that date, Byard agreed to pay Tucker $250,000 for the Thomas Interest, plus $20,000 upon the execution of an agreement with Cinergy, Inc. regarding a utility easement ("Byard's Contingent Offer").

12. The Settlement Agreement provides that the Purchase Agreement would contain no representations or warranties by Village or Byard relating to the sale of the Village Property.

13. On April 4, 2005, Tucker filed with the Marion Superior Court his Receiver's Application for Employment of Counsel, Nunc Pro Tunc, and for Authority to Pay Interim Compensation to Such Counsel, wherein he requested authority to employ himself as well as Timothy L. Black of the law firm of Feiwell & Hannoy ("Black") as counsel (collectively, "Counsel"). The Marion Superior Court approved the Application on April 12, 2005.

14. On April 15, 2005, Curran informed Tucker that it would not release the Plans to Britton upon payment of the work performed to date, that the Plans were the intellectual property of Curran and that Curran expected payment for all amounts due under its contract with Village.

Curran also indicated that it would not negotiate with anyone other than Byard.

15. Although the Purchase Agreement was not contingent upon Curran's release of the Plans, Tucker believed that Byard had acted in bad faith and that he had persuaded Curran to not release the Plans.

16. On or about April 15, 2005, Tucker informed Byard that he would sell the Village Property and/or Thomas Interest to the highest bidder. Thereafter, Tucker began negotiating for the sale of the Village Property to Britton without the Plans and advised Byard of such effort.

17. Between approximately April 15 and April 26, 2005, Tucker considered various offers from Britton and Byard. He refused to accede to Byard's demands to complete the Settlement Agreement or to acknowledge Byard's option to purchase under Village's Operating Agreement.

18. On or about April 26, 2003, Tucker received another offer from Byard, wherein he offered to purchase the Thomas Interest for $340,000, with $250,000 to be paid immediately and $90,000 to be paid within approximately four months of the offer pursuant to an unsecured note ("Byard's Second Offer").

19. On April 29, 2005, Tucker received a signed cash offer from Britton to purchase the Village Property for $570,000 ("Britton's Second Offer"). This offer did not provide for payment to Curran for release of the Plans. Tucker estimated that Britton's Second Offer, after payment to Curran for work performed to date, would net between $346,000 to $414,000 for the estate, would be more quickly available for distribution to creditors and was, therefore, superior to Byard's Second Offer.

20. Byard refused, however, to sell the Real Property to Britton and withdrew his Second Offer in an effort to enforce the Settlement Agreement.

21. On May 12, 2005, Byard tendered to Tucker his Exercise of Irrevocable Secondary Option to Purchase Doug Thomas' Membership Units in Village Development One, LLC ("Byard's Third Offer"). The terms of Byard's Third Offer were made pursuant to Section 8.2 of Village's Operating Agreement and provided in relevant part:

> Section 8.2(b) provides that the purchase price of Mr. Thomas' Member Units "shall be the fair market value of such Units as of the date of the [Triggering] event giving rise to the purchase right", effectively, February 9, 2005. Specifically, Section 8.2(b) provides that the fair market value of Mr. Thomas' Member Units shall be determined (1) by agreement between Mr. Thomas and Mr. Byard, (2) if such agreement is not reached within ten (10) days of this exercise of Mr. Byard's Secondary Option, then the fair market value of Mr. Thomas' Member Units shall be determined by an appraiser agreed upon by Mr. Thomas and Mr. Byard (the cost of such appraisal to be split between Mr. Thomas and Mr. Byard, or (3) where neither agreement can be reached as set forth in (1) and (2) above, then the fair market value shall be determined by a specific independent appraisal process set forth in Section 8.2(b)(iii) of the Agreement.
>
> In all events, the fair market value for Mr. Thomas' Member Units, as determined in accordance with Section 8.2 of the Agreement, shall be payable by Mr. Byard (1) twenty-five percent (25%) in cash within ninety (90) days of his exercise of the Secondary Option to purchase Mr. Thomas' Member Units, and (2) remaining balance of the purchase price in the form of a promissory note payable to no more than five (5) successive annual installments, the first of which shall be due one (1) year after the date of the original twenty-five percent (25%) cash payment. The promissory note shall accrue interest on the balance thereof at the Prime Rate.

22. On May 12, 2005, Tucker filed his Receiver's Application to Dissolve Village Development One, LLC (the "Dissolution Application") and Motion for Injunctive Relief (the "Injunction Motion"), wherein he sought authorization to accept Britton's Second Offer and to restrain Byard from blocking the sale. The Marion Superior Court set a hearing on the Dissolution Application and Injunction Motion for May 23, 2005.

23. On May 12, 2005, Byard filed an adversary proceeding in the Laminating Bankruptcy against Thomas and Tucker, alleging that Byard had exercised his rights to purchase the Thomas Interest under the terms of Village's operating agreement (the "AP").

5

24. On May 20, 2005, Byard filed a Notice of Removal in the AP alleging that Tucker was attempting to exercise control over Laminating's assets. On that same day, Byard filed a Notice of Notice of Removal in the Receivership Action.

25. On May 22, 2005, Byard filed an Emergency Motion for Order Staying State Court Proceeding in the AP (the "Emergency Motion"), wherein he sought to stay the hearing in the Receivership Action on the Dissolution Application and Injunction Motion.

26. On May 23, 2005, at 9 a.m., as no stay order had been entered on the Emergency Motion, the Marion Superior Court conducted a hearing on the Dissolution Action and Injunction Motion. During the hearing, counsel for Byard approached several of Thomas's creditors and secured their signatures for an involuntary Chapter 7 petition against Thomas. Counsel then left the hearing, filed the involuntary petition (the "Thomas Bankruptcy"), returned to the Marion Superior Court, and stopped the hearing from proceeding further.

27. On October 11, 2005, Gregory K. Silver, the Chapter 7 trustee in the Thomas Bankruptcy (the "Trustee") filed with the bankruptcy court a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019, for Settlement and Compromise of Claim of David R. Byard, for authority to accept an offer from Byard for the Thomas Interest in the amount of $340,000. Per the terms of this settlement, Byard also waived any claims that he may have had against either the Thomas or Laminating bankruptcy estates. Such motion was granted on December 16, 2005.

28. On November 23, 2005, Tucker filed his Motion for Allowance and Payment of Administrative Expenses on the Claim of William J. Tucker, State Court Receiver (the "Motion."), seeking fees and expenses for both Tucker and Counsel in the amount of $51,965.50. On December 5, 2005, Tucker refiled the Motion, along with several exhibits detailing the requested fees and

exhibits. At hearing on the Motion, Black indicated that the Motion slightly overstated his fees and that the correct total amount was $51,542.50. This amount includes the following:

> William J. Tucker as Receiver, 47.85 hours at $350.00 per hour for total fees of $16,747.50;
> William J. Tucker as Counsel, 22.00 hours at $350.00 per hour for total fees of $7,700.00;
> C. Abraham Murphy as Counsel, 56 hours at $200.00 per hour for total fees of $11,060.00;
> Jeffrey M. Hester as Counsel, 25.10 hours at $250.00 per hour for total fees of $6,275.00;
> Steven K. Dick as Counsel, .30 hours at $260.00 per hour for total fees of $78.00;
> Tim Black as Counsel, 41.20 hours at $235.00 per hour for total fees of $9,682.00

29.   The Motion also requested expenses in the amount of $429.58.

30.   The Trustee and Thomas objected timely to the Motion.

### Conclusions

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

2.   Together, Code §§ 503 and 507 give administrative expense priority to the actual and necessary expenses of "a custodian superseded under § 543 of this title, and compensation for the services of such custodian" and for "the reasonable compensation for the professional services rendered by an attorney" for a custodian. *See* 11 U.S.C. §§ 503(b)(3)(E), 503(b)(4) and 507(a)(1).

3.   Under Code § 543, a custodian is generally required to deliver all property of the debtor to the trustee and to account to the trustee for the property that was in the custodian's possession or control. Pursuant to § 101(11) of the Code, Tucker qualifies as a "custodian."

4.   Nothing in § 503(b)(3)(E) sets forth a standard for awarding compensation for a custodian's services. Courts have generally looked to a reasonableness standard. *See In re Sevitski*, 161 B.R. 847 (Bankr.N.D.Okla.1993)(applying standard set forth in §§ 330(a) and 503(b)(2)); *In*

*re Synergy Props., Inc.*, 130 B.R. 700 (Bankr.S.D.N.Y.1991) (awarding reasonable compensation using the standard set forth in § 503(b)(4)).

     5.     In awarding fees under § 330(a), the Court considers the nature, extent and value of the services rendered, taking into account (1) the time spent on the services; (2) the rates charged for the services; (3) whether the services were necessary to the administration of, or beneficial at the time the services were rendered toward the completion of, the case; (4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem or task; and (5) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. *See* 11 U.S.C. § 330(a)(3)(A). Furthermore, the Court will not allow compensation for the unnecessary duplication of services or services that were not reasonably likely to benefit the debtor's estate or necessary to the administration of the case.

     6.     Compensation awarded under § 503(b)(4) is "based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney . . . ."

     7.     In objecting to the Motion, the Trustee and Thomas argue that Tucker and Counsel's fees should not be allowed, at least not in full, because their services did not benefit the estate. In support of that argument, they emphasize that Tucker did not turn over any money or tangible personal property to the Trustee other than some business records. They further emphasize that despite his efforts, Tucker did not sell the Village Property or the Thomas Interest and that he may have actually exposed the estate to liability by refusing to comply with the terms of either the Settlement Agreement or Village's Operating Agreement.

8. Clearly, Tucker and Counsel spent a great deal of time and effort in trying to sell the Village Property and/or Thomas Interest. However, like the Trustee and Thomas, the Court is concerned about Tucker's refusal to honor the terms of the Settlement Agreement or Village's Operating Agreement. Arguably, such refusal exposed the estate to claims by Byard for, in the very least, breach of contract. Contrary to Tucker's assertions, there was no evidence to suggest that Byard improperly influenced Curran or acted in bad faith. Prior to the creation of the Receivership, Curran had already sued Village, Thomas and Byard for breach of contract. That action suggests to the Court that, short of being fully paid, Curran would be unwilling to turn over the Plans or to otherwise cooperate with Tucker's efforts to sell the Village Property. If the Plans were that crucial to closing the Purchase Agreement, then the parties should have negotiated a different bargain and/or included Curran in the settlement negotiations.

9. The price Byard paid to the Trustee for the Thomas Interest was ultimately more than what he was required to pay under the Settlement Agreement. Tucker arguably played a role in exacting that higher price. However, in frustrating Byard's efforts to buy the Thomas Interest, Tucker incurred substantial legal fees, prompted an involuntary bankruptcy and exposed the estate to possible liability.

10. Based on the foregoing, the Court cannot conclude that the services provided by Tucker and Counsel after April 15, 2005, i.e., the date on which Curran refused to turn over the Plans and the Settlement Agreement fell through, were "reasonably likely to benefit the debtor's estate." Thus, the Court will allow as an administrative expense only those fees that were incurred by Tucker and Counsel on or before April 15, 2005. Accordingly, Tucker, as Receiver, is entitled to $10,237.50. As Counsel, Tucker is entitled to $9,580.00, and Black is entitled to $1,433.50. The

9

Court also allows $429.58 in expenses.

      11.      The balance of the fees requested in the Motion are disallowed.

###

Distribution:

William J. Tucker
Timothy L. Black
James Knauer
Other Appearances
UST